IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS – SPRINGFIELD DIVISION

| | |
|---|---|
| KIMBERLYNN BOLANOS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JOHN BALDWIN, MELVIN HINTON, WEXFORD HEALTH SOURCES, JEFFREY SIM, LUKE FAIRLESS, NORINE ASHLEY, MARJORIE ARDON, DENISE MOOS, JENNIFER MCCLELLAN, MICHAEL KESSLER, KEENA PEEK, MICHAEL LONG, and other as-yet-unidentified employees of Wexford or the Illinois Department of Corrections,<br><br>　　　　Defendants. | No.<br><br><br><br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Kimberlynn Bolanos, through her counsel, Uptown People's Law Center, complains against defendants John Baldwin, Melvin Hinton, Jeffrey Sim, Luke Fairless, Norine Ashley, Marjorie Ardon, Denise Moos, Jennifer McClellan, Michael Kessler, Keena Peek, Michael Long, and Wexford Health Sources as follows:

### JURISDICTION AND VENUE

1.　This is an action brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of plaintiff's rights as secured by the United States Constitution.

1

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

3. Venue is proper in this district under 28 U.S.C. § 1391(b) because plaintiff resides in this judicial district and the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

4. Plaintiff Kimberlynn Bolanos is a twenty-six-year-old woman who is currently in the custody of the Illinois Department of Corrections ("IDOC").

5. At all times relevant to this complaint, defendant John Baldwin was the Director of IDOC. He was responsible for overseeing operations at IDOC, including mental health care.

6. At all times relevant to this complaint, defendant Melvin Hinton was the Director of Mental Health for IDOC. He was responsible for overseeing mental health treatment for prisoners in IDOC.

7. For a portion of the time relevant to this complaint, defendant Jeffrey Sim was IDOC's Central Regional Psychologist Supervisor with oversight of Logan Correctional Center ("Logan"). He was responsible for overseeing the mental health care provided at Logan Correctional Center, ensuring that the mental health care provided adhered to departmental regulations and that the patients received the care they needed.

8. For a portion of the time relevant to this complaint, defendant Luke Fairless was IDOC's Central Regional Psychologist Supervisor with oversight of Logan Correctional Center. He was responsible for overseeing the mental health

2

care provided at Logan Correctional Center, ensuring that the mental health care provided adhered to departmental regulations and that the patients received the care they needed.

9. At all times relevant to this complaint, defendant Norine Ashley was the Director of Mental Health at Logan Correctional Center, the IDOC facility where plaintiff was incarcerated.

10. At all times relevant to this complaint, defendant Dr. Marjorie Ardon was the psychiatrist responsible for plaintiff's mental health treatment and care.

11. At times relevant to this complaint, defendant Denise Moos was a mental health counselor with responsibility for plaintiff's mental health treatment and care.

12. At times relevant to this complaint, defendant Dr. Jennifer McClellan was a psychologist and the Mental Health Services Director of the Logan Correctional Center Residential Treatment Unit ("RTU"), where plaintiff was housed and where she was supposed to receive mental health treatment. Dr. McClellan was responsible for overseeing care and treatment in the RTU, and also personally participated in plaintiff's treatment planning.

13. At times relevant to this complaint, defendant Dr. Michael Kessler was a psychologist with responsibility for plaintiff's mental health treatment and care.

14. At times relevant to this complaint, defendant Dr. Keena Peek was a psychologist with responsibility for plaintiff's mental health treatment and care.

3

15. At times relevant to this complaint, defendant Michael Long was a mental health professional with responsibility for plaintiff's mental health treatment and care.

16. At all times relevant to this complaint, defendant Wexford Health Sources had a contractual obligation to provide mental health treatment to people in the custody of IDOC.

## Background

17. Plaintiff Kimberlynn Bolanos is a twenty-six-year-old woman who has struggled with very serious mental illness since her teenage years.

18. In 2013, when plaintiff was twenty-one years old, plaintiff experienced an episode of psychosis during which she committed a violent act and attempted to kill herself.

19. Plaintiff did not succeed in taking her own life, but she was charged with homicide.

20. Plaintiff continued to experience mental health crises while the criminal charges were pending against her, at times requiring inpatient mental health treatment.

21. In 2016, plaintiff was found "guilty but mentally ill" on the homicide charge and was sentenced to a 38-year term in the IDOC.

## Assessments at Logan Correctional Center
## Demonstrate that Plaintiff Has Very Serious Mental Health Needs and Poses a Substantial Risk of Harm to Herself

22. Plaintiff arrived at Logan Correctional Center on or around November 2, 2016.

23. At the time, plaintiff was on several psychiatric medications, including an anti-psychotic medication, all of which had been prescribed to her in the Cook County Jail.

24. Plaintiff reported to Logan intake staff that she had a history of auditory hallucinations and that she often woke during the night screaming.

25. She also told intake staff that she had a history of multiple suicide attempts, including an overdose of anti-psychotic medications approximately one month prior to her arrival at Logan.

26. Approximately one week after her arrival at Logan, plaintiff underwent a comprehensive psychological evaluation by psychologist Brian Richardson.

27. Richardson noted that plaintiff had an extensive history of self-mutilation and suicide attempts and that the behavior was motivated by psychotic processes.

28. Richardson diagnosed plaintiff with paranoid schizophrenia and major depressive disorder.

29. He further noted: "She is prone to borderline-like decompensations into self-destructiveness."

5

30. In terms of future treatment, Richardson concluded: "This patient appears to be suffering from the early stages of a chronic mental illness, and guilt from her crime creates a motivation for 'self-torture' that could lead to tragic consequences until she is stabilized and monitored for stability."

31. Richards recommended that plaintiff receive treatment in Logan's Residential Treatment Unit ("RTU"). At the time, the RTU was the highest level of treatment that IDOC provided to prisoners.

### Dr. Ardon's First Meeting with Plaintiff

32. On November 11, 2016, plaintiff underwent a psychiatric evaluation with defendant Dr. Marjorie Ardon.

33. During that evaluation, Dr. Ardon observed that plaintiff was having suicidal thoughts and that she was experiencing several signs of psychosis, including auditory and visual hallucinations.

34. Dr. Ardon diagnosed plaintiff with schizoaffective disorder. She estimated plaintiff's suicide risk as "high," and wrote in all caps: "IT IS NOTED THAT THE INMATE HAS REPEATED SUICIDAL ATTEMPTS WITHOUT TELLING ANYONE ABOUT THEM."

35. Dr. Ardon also noted that plaintiff had not been taking her psychiatric medications as prescribed.

36. Dr. Ardon renewed plaintiff's prescription for psychiatric medications, changing the dosage of plaintiff's anti-psychotic medication.

37. Psychiatrists know that it is important to closely monitor patients on anti-psychotic medication, particularly when medication has been changed and when medication non-compliance may be an issue.

38. Dr. Ardon did not monitor plaintiff closely, however; she did not see her again for almost two months.

### Dr. Ardon's Second Meeting With Plaintiff

39. Dr. Ardon had her second meeting with plaintiff on January 8, 2017. The meeting occurred by video.

40. At this meeting Dr. Ardon learned that plaintiff's issues with medication non-compliance had gotten worse since the November 11 appointment.

41. Dr. Ardon noted that plaintiff did not want to talk to Dr. Ardon during the January 8 meeting.

42. Dr. Ardon observed that plaintiff would not look directly at Dr. Ardon; instead, plaintiff looked sideways, toward a window, with her hair covering her face.

43. Despite her knowledge that plaintiff faced a serious risk of harm, Dr. Ardon simply told plaintiff that her medication would be discontinued if she refused three doses, and took no other action in terms of treatment.

44. The January 8, 2017 meeting lasted approximately 13 minutes.

### Plaintiff's "Treatment Planning" from January 2017 to June 2017

45. All prisoners who receive ongoing mental health treatment are required to have individualized "treatment plans" prepared collectively by the prisoner's mental health treatment team.

7

46. The treatment plan is one of the most important documents in a patient's mental health record: it guides the delivery of care and service by all actors in the mental health system.

47. Between January 2017 and June 2017, defendant Denise Moos created and updated plaintiff's treatment plans.

48. Although Moos "updated" plaintiff's treatment plan six times during this period, a close look at the plans shows that little care or attention was put toward these efforts.

49. For example, all six treatment plans (a) incorrectly state that plaintiff was found <u>not</u> guilty but mentally ill, when in fact she was found guilty but mentally ill; (b) omit plaintiff's most serious mental health diagnoses, including paranoid schizophrenia, and (c) contain the same typographical errors, strongly suggesting that the same document was simply re-printed with a new date on each of the six occasions.

50. None of the treatment plans constituted a medically acceptable plan for treatment of plaintiff's severe mental illness.

51. Moos interacted with plaintiff for only a few minutes in connection with four of the treatment plan updates.

52. During each of these meetings it was clear that the existing treatment plan was not working and that plaintiff was getting worse.

53. Nevertheless, the records for all four of these meetings contain identical language for the "Recommendation" and "Plan" portions, strongly

suggesting that Moos' treatment planning consisted of a perfunctory cut-and-paste job as opposed to the application of professional medical judgment.

54. Dr. Ardon did not participate in any of Moos's treatment planning.

### Plaintiff's Mental Illness Goes Untreated

55. The primary form of treatment for people with schizophrenia and related psychotic disorders is medication.

56. Trained mental health professionals know that patients like plaintiff who experience psychosis often become non-compliant with psychiatric medications.

57. As the American Psychiatric Association's ("APA") Practice Guidelines put it: "Not uncommonly, patients with schizophrenia stop taking medications, miss clinic appointments, fail to report essential information to their psychiatrists, and otherwise choose to not participate in recommended treatments." *See* American Psychiatric Association, Practice Guideline For The Treatment of Patients With Schizophrenia 19 (2d ed. 2004), https://psychiatryonline.org/pb/assets/raw/sitewide/practice_guidelines/guidelines/schizophrenia.pdf.

58. Trained mental health professionals also know that medication non-compliance poses a serious risk of harm to patients like plaintiff.

59. According to the APA Practice Guidelines, "Most patients who develop schizophrenia and related psychotic disorders (schizoaffective disorder and schizophreniform disorder) are at very high risk of relapse in the absence of antipsychotic treatment." *Id.* at 38.

60. For these reasons, mental health professionals know it is extremely important to promote medication compliance among patients like plaintiff.

61. Psychiatrists and other mental health professionals employ a variety of strategies for securing medication compliance. *Id.* at 18-19. Among the most effective of these strategies is building a "therapeutic alliance" with the patient and closely monitoring the patient for adverse side effects. *Id.* at 10, 18-19.

62. When medication non-compliance poses a risk of harm to the patient or others, mental health professionals can and should take steps to enforce medication compliance. *Id.*

63. In other words, medication non-compliance is a foreseeable complication of schizophrenia and related disorders; it is itself something that mental health professionals should actively address, not ignore.

64. Furthermore, when one method of achieving compliance is proven ineffective, mental health professionals should attempt another method.

65. All of the mental health professionals responsible for plaintiff's care knew that plaintiff's medication non-compliance posed a substantial risk of harm to plaintiff, and none of them took meaningful steps to address plaintiff's medication non-compliance.

### Plaintiff Attempts Suicide, is Placed on "Crisis Watch," Where She Receives No Treatment and Self-Mutilates

66. On June 6, 2017, plaintiff experienced a serious mental health emergency.

67. That day, plaintiff's mental illness caused her to run out of the building where she was housed and run across the prison yard toward a fence yelling "shoot me, shoot me."

68. This action was incredibly dangerous, as it could have resulted in plaintiff or someone else being shot by armed prison guards.

69. At this point, plaintiff clearly needed emergency psychiatric treatment.

70. As the APA Practice Guidelines put it: "Rapid initiation of emergency treatment is needed when an acutely psychotic patient is exhibiting aggressive behaviors toward self, others, or objects." *Id.* at 27.

71. Rather than provide plaintiff with emergency treatment, however, one or more of the defendants and/or an as-yet-unidentified IDOC and/or Wexford employee sent plaintiff to "crisis watch."

72. At the time, IDOC and Wexford had a custom of using "crisis watch" as a form of *de facto* solitary confinement. They used "crisis watch" to isolate and contain people experiencing serious mental health crises, but *not* to actually provide them with needed treatment.

73. Consistent with IDOC and Wexford's custom, it was not until *two days* after plaintiff's suicide attempt that she had an encounter with a mental health professional.

74. The mental health professional who saw plaintiff on June 8, Lindsay Hummel, spent only 5 minutes with plaintiff.

11

75. In that 5-minute meeting, Hummel observed that plaintiff was staring at the wall of her cell and talking to something. Plaintiff told Hummel that she was talking to a "friend," and then she began picking at her ear and started laughing.

76. Thereafter, Hummel consulted with Dr. McClellan, who decided to place plaintiff on a 10-minute watch (apparently decreased from her initial classification of "continuous watch") and took no action in terms of treatment.

77. The next day, on June 9, another mental health professional saw plaintiff, this time for 10 minutes. This professional, Rebecca Goldsmith, noted that plaintiff was hearing voices and said she wanted to die.

78. During the meeting plaintiff pointed at Goldsmith's face and asked, "Is that your nose, your lips, your pores?"

79. Goldsmith consulted with Dr. Peek, who decided to keep plaintiff on 10-minute watch, and took no action in terms of treatment.

80. Later that afternoon, Dr. Ardon, Dr. Kessler, and LPC Long had a conference to discuss plaintiff. They discussed the fact that plaintiff was experiencing "active psychosis," and Dr. Ardon recommended that plaintiff should be treated by enforced medication.

81. Instead of providing plaintiff with treatment at that time, however, Dr. Ardon, Dr. Kessler, and LPC Long decided that Dr. Ardon would set an appointment with plaintiff at some undetermined future date to discuss medication enforcement.

82. In the meantime, plaintiff continued to deteriorate, going completely without treatment and sitting alone in her cell, entirely isolated.

83. On June 11, while experiencing an episode of psychosis, plaintiff removed each one of her eyes completely from their sockets.

84. A nurse who was summoned to the scene observed that plaintiff's face, legs, and feet were covered in blood, and that one of plaintiff's eyes was on the bed and the other was on the ground.

85. Plaintiff was taken to an outside emergency room, where her mental illness was finally treated with medication.

86. As a result of the June 11 incident, plaintiff is permanently blind.

### Baldwin, Hinton, Ashley, Sim, Fairless, and Wexford's Role

87. At all times relevant to this complaint, defendants Baldwin, Hinton, Ashley, Sim, Fairless, and Wexford knowingly maintained an inadequate mental health care system throughout IDOC.

88. In 2007 a federal class action lawsuit was filed in the Central District of Illinois concerning IDOC's failure to provide adequate mental health care in Illinois prisons. *See Rasho v. Baldwin*, No. 07-cv-1298-MMM (C.D. Ill.).

89. As the litigation progressed, the Court appointed monitors who investigated systemic problems in IDOC's mental health care system, identified key problem areas, and made recommendations for change.

90. By 2015, defendants Baldwin, Hinton, Ashley, Sim, and Fairless were personally aware from their participation in the *Rasho* litigation that IDOC's

mental health care program suffered from a number of systemic problems that posed significant dangers to prisoners with mental illness.

91. The same was true for Wexford. Although Wexford was not a defendant in the *Rasho* litigation, Wexford personnel who made policy-level decisions with respect to its IDOC contract remained abreast of all major issues in *Rasho* and participated in settlement negotiations.

92. Specifically, Baldwin, Hinton, Ashley, Sim, Fairless and Wexford were aware in or around 2015 of the following systemic problems:

   a. IDOC mental health programs were dangerously understaffed;

   b. Patients on psychotropic medication were inadequately monitored;

   c. Treatment planning was done in a perfunctory manner that did not address the individual patients' treatment needs; and

   d. The mental health treatment needs of patients on "crisis watch" were not addressed.

93. Defendants Baldwin, Hinton, Ashley, Sim, Fairless and Wexford knew that the systemic problems identified above posed a substantial risk of harm to prisoners with serious mental illness.

94. In December 2015, defendant Baldwin signed a settlement agreement on behalf of IDOC with the *Rasho* plaintiffs. Pursuant to this agreement, Defendants Baldwin and Hinton pledged to work with Wexford to address the systemic problems identified above.

95. Notwithstanding the settlement agreement, defendants Baldwin, Hinton, Ashley, Sim, Fairness and Wexford did not take reasonable steps to address the systemic problems identified above, and the systemic problems persisted until and throughout 2017.

96. The systemic problems identified above were the moving force behind the actions and omissions of the mental health professionals who interacted with plaintiff at Logan Correctional Center from November 2016 to June 2017.

## COUNT ONE:
## 42 U.S.C § 1983 – EIGHTH AMENDMENT

97. Plaintiff repeats and re-alleges all of the paragraphs in this complaint as if fully set forth herein.

98. As described in further detail above, defendants violated plaintiff's right under the Eighth Amendment of the United States Constitution to be free from cruel and unusual punishment.

99. As a result of the misconduct described in this count, plaintiff suffered physical, emotional, and psychological harm.

WHEREFORE, plaintiff Kimberlynn Bolanos respectfully requests that the Court enter judgment in her favor and against all Defendants for compensatory damages, punitive damages, and attorneys' fees and costs, and for any other relief deemed proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, plaintiff demands a jury trial on all issues so triable.

Respectfully Submitted,

**KIMBERLYNN BOLANOS**

By: /s/ Elizabeth Mazur
One of plaintiff's attorneys

Alan Mills
Elizabeth Mazur
Nicole Schult
Uptown People's Law Center
4413 N. Sheridan
Chicago, Illinois 60640
(773) 769-1411